

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-18-00140-CV

IN THE MATTER OF D.C.

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-106239-17

----------

## MEMORANDUM OPINION[1]

----------

The State has alleged appellant D.C., a juvenile, committed several felonies. This appeal concerns whether D.C.'s case will be handled in juvenile court or adult court. The juvenile court concluded it should be the latter and signed an order waiving its jurisdiction over this case and transferring it to the appropriate adult court for criminal proceedings. *See* Tex. Fam. Code Ann. § 54.02(a) (West 2014), § 56.01(c)(1)(A) (West Supp. 2017). In a single issue,

---

[1]*See* Tex. R. App. P. 47.4.

D.C. argues that order was an abuse of discretion. We do not agree and therefore affirm the juvenile court's order.

## I. BACKGROUND

Aurelio Montelongo and his girlfriend, Maria Gomez, arrived at the Spanish Hacienda Apartments in Fort Worth a little before midnight on June 30, 2017. They had come into town for a weekend visit, and as they were unloading their luggage, a stolen white Honda CR-V drove past, turned around, and parked behind them. The couple began walking toward the apartment when a black male got out of the CR-V, came up to them, pointed a gun at them, and said, "Give me your wallet." Unsure whether it was a joke, Montelongo and Gomez continued walking toward the apartment until the assailant fired a gunshot in the air. The robber took Montelongo's wallet as Gomez ran into the apartment, and then the robber returned to the CR-V, which drove away.

In making its getaway, the CR-V came upon Moses Padron, who was in his car just outside the apartment complex. Padron reported that two males in the CR-V—one of whom police later determined was D.C.—"rolled up on him," and one of the males asked him for a cigarette. But Padron believed they were about to rob him, so he backed up, and as he did so, D.C. leaned out of the CR-V's window and fired a gun, and the bullet struck Padron in the shoulder.

At approximately 2:00 a.m. on July 1, 2017, the CR-V stopped on the shoulder of the highway near a taco truck owned and operated by Jose Ontiveros and his sister, who were both in the truck assisting some customers who had just

2

ordered some tacos. D.C. and another juvenile, D.P., got out of the back passenger side of the SUV, both carrying guns, while the driver remained inside the car. D.C. and D.P. ran up to one of the customers, one of the assailants put a gun to the customer's head, and the customer heard someone say, "Give me the f****** money." Attempting to protect his customers, Ontiveros retrieved his own gun and pointed it out the taco truck's window and then went outside to confront the robbers. D.P. then shot Ontiveros in the abdomen, and he and D.C. ran back to the CR-V with the money from the customer's wallet in tow. D.P. and D.C. got into the front and back passenger seats, and the driver sped away. Ontiveros died a few days later as a result of the gunshot wound he sustained during the robbery.

Approximately three hours later, Ronald Meyers was sitting outside his driveway smoking a cigarette when D.C. and D.P. approached him, at least one of them put a gun to his head, and they demanded his wallet. His wallet was inside his home, however, and when D.C. and D.P. learned this, they walked him inside his house—all the way to his kitchen—to get his wallet. With a gun pointed at his head, Meyers searched for his wallet but was unable to find it, so D.C. and D.P. took Meyers's iPhone off the kitchen counter and ran.

Approximately eight days later, early in the morning of July 9, 2017, D.C. and two other individuals, all three armed with handguns, entered the unlocked back door of Scott Albosta's residence, pointed their guns at him, and demanded he give them his cell phone. They then went throughout his house searching

3

through drawers, rooms, and closets for about fifteen to twenty minutes before locking Albosta in his bathroom. The three then drove off in Albosta's black 2014 Acura MDX, having stolen Albosta's debit cards. As they drove away, D.C. fired two gunshots out the back window of the car.

Around 5:30 a.m. on July 9, Lisa Ruddick and Justin Hawkins had been in their garage when D.C. and two other individuals approached, all three holding handguns. One of the gunmen held a gun to Ruddick's head as she laid on the ground, while the other two approached Hawkins and demanded he give them his wallet and phone. Hawkins attempted to stall by asking the two gunmen to repeat themselves, pretending he did not hear what they were saying. That is when the third gunmen said, "Let's take them in the house," which caused Hawkins, who was holding a car battery charger, to become fearful. Hawkins threw the battery charger at the gunman who was standing in front of him and then dove in front of the car in his garage. Hawkins heard a gunshot immediately after diving. While all of this was happening, at least one of gunmen got into Ruddick's car and took her purse, keys, and cell phone, as well as Hawkins's cell phone. After the gunshot went off, the three assailants fled.

On July 16, 2017, Travis Bannon reported that his F-150 pickup truck had been stolen. At about 4:45 a.m. the next day, in response to a report of a suspicious person, a Burleson Police Department patrol officer located Bannon's stolen pickup and initiated a traffic stop, after which the driver drove the pickup forward a little bit before pulling into a driveway. The driver turned out to be D.C.

4

When officers searched inside the stolen pickup, they found a driver's license that belonged to Yulanda McGowan, debit cards, tools, insurance cards, Six Flags theme park passes, phone cords, and money. Yulanda and her husband, Chester, told police that someone had been in their house overnight while they were asleep and had stolen the items that the Burleson Police Department officers had discovered in the stolen pickup.

## II. THE JUVENILE COURT'S WAIVER AND TRANSFER DETERMINATION

The State filed a petition in the juvenile court pursuant to family code section 54.02 alleging that D.C. was subject to the juvenile court's jurisdiction because he had committed multiple felonies when he was fifteen years old. The petition alleged D.C. had committed ten felony offenses: one count of capital murder, a capital felony; two first-degree felony counts and one second-degree felony count of burglary of a habitation; four counts of aggravated robbery, a first-degree felony; one second-degree felony count of aggravated assault; and one count of unauthorized use of a motor vehicle, a state-jail felony, as well as other offenses the State later waived.[2] *See* Tex. Penal Code Ann. §§ 19.03(a)(2), (b) (capital murder), 30.02(a)(1), (c)(2), (d)(2) (burglary of a habitation) (West Supp.

---

[2]The State initially pleaded but later waived five paragraphs alleging misdemeanor counts of burglary of a vehicle. *See* Tex. Penal Code Ann. § 30.04(a) (West Supp. 2017). The State additionally waived a paragraph alleging an additional count of aggravated assault because that paragraph's allegations were "subsumed into the allegations alleged" elsewhere in the petition. And the State further waived a paragraph alleging an additional second-degree felony count of burglary of a habitation because the allegations were "an alternate manner and means of the" prior paragraph.

5

2017), § 22.02(a)(2), (b) (West 2011) (aggravated assault), § 29.03(a)(2), (b) (West 2011) (aggravated robbery), § 31.07(a)–(b) (West 2016) (unauthorized use of a motor vehicle). The State asserted that because of the seriousness of the alleged offenses and D.C.'s background, the welfare of the community required criminal proceedings, and it accordingly asked the juvenile court to waive its jurisdiction and transfer D.C. to the appropriate court for criminal proceedings.

The juvenile court ordered the Tarrant County Juvenile Probation Department to prepare a complete diagnostic study, a social evaluation, and a full investigation of D.C., of D.C.'s circumstances, and of the circumstances surrounding D.C.'s alleged offenses, including a social study and psychological evaluation of D.C. *See* Tex. Fam. Code Ann. § 54.02(d). After the probation department did so, the juvenile court held a hearing on the State's petition. Following the hearing, the juvenile court signed the written order at issue here, which waived its jurisdiction over this case and transferred D.C. to the appropriate adult court for criminal proceedings. In the order, the juvenile court found there was probable cause to believe that D.C. had committed the ten felonies the State alleged; that he was fifteen years old at the time he committed those offenses; and that because of the seriousness of the alleged offenses and D.C.'s background, the welfare of the community required criminal proceedings. *See id.* § 54.02(a).

The order further states that in making its determination, the juvenile court had considered, among other matters, the four factors set forth in family code

6

section 54.02(f). *See id.* § 54.02(f). In that regard, it found that four of the alleged offenses—the three burglary counts and the single count of unauthorized use of a motor vehicle—were against property and that the remaining six alleged offenses were against the person of another, *see id.* § 54.02(f)(1); that D.C. was of sufficient sophistication and maturity to be tried as an adult, *see id.* § 54.02(f)(2); that the likelihood of reasonable rehabilitation of D.C. by use of procedures, services, and facilities currently available to the juvenile court was low, *see id.* § 54.02(f)(4); and that after considering all the testimony, the diagnostic study, the social evaluation, and a full investigation, it was contrary to the best interests of the public to retain jurisdiction, *see id.* § 54.02(a)(3).

In a single issue, D.C. appeals, arguing the juvenile waiver and transfer decision was an abuse of discretion.

### III. APPLICABLE LAW AND D.C.'S CONTENTION

The juvenile courts have exclusive original jurisdiction over all proceedings involving persons accused of committing a felony offense between their tenth and seventeenth birthdays. *See* Tex. Fam. Code. Ann. §§ 51.02(2), 51.03(a)(1), 51.04(a) (West Supp. 2017); *Moon v. State*, 451 S.W.3d 28, 37–38 (Tex. Crim. App. 2014). In certain situations, however, a juvenile court has discretion to waive that jurisdiction and transfer child felony offenders to the appropriate district court or criminal district court for criminal proceedings. *See* Tex. Fam. Code Ann. § 54.02(a); *Moon*, 451 S.W.3d at 38. Before exercising that discretion, the juvenile court must find that

7

(1) the child is alleged to have violated a penal law of the grade of felony;

(2) the child was:

> (A) 14 years of age or older at the time [of the alleged offense], if the offense is a capital felony . . . or a felony of the first degree, and no adjudication hearing has been conducted concerning that offense; or

> (B) 15 years of age or older at the time [of the alleged offense], if the offense is a felony of the second or third degree or a state jail felony, and no adjudication hearing has been conducted concerning that offense; and

(3) after a full investigation and a hearing, [it] determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.

*See* Tex. Fam. Code Ann. § 54.02(a); *Moon*, 451 S.W.3d at 38. In making these findings, the juvenile court must consider, among other matters,

> (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

> (2) the sophistication and maturity of the child;

> (3) the record and previous history of the child; and

> (4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

*See* Tex. Fam. Code Ann. § 54.02(f); *Moon*, 451 S.W.3d at 38. These are nonexclusive factors that serve to facilitate the juvenile court's balancing of the potential danger to the public posed by the particular juvenile offender with his

8

amenability to treatment. *Moon*, 451 S.W.3d at 38. If the juvenile court waives jurisdiction, "it shall state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court, and shall transfer the person to the appropriate court for criminal proceedings." Tex. Fam. Code Ann. § 54.02(h).

D.C. concedes that the juvenile court made the proper findings in its transfer order as required by the Texas Family Code and by *Moon*. His sole argument for why the juvenile court abused its discretion is that with regard to the fourth consideration under family code section 54.02(f), "the factual evidence introduced at trial established that the juvenile court should have retained jurisdiction because there were sufficient safeguards in place for the public and a very high probability of rehabilitation for D.C. by use of procedures, services, and facilities currently available to the juvenile court." *See id.* § 54.02(f)(4).

## IV. DISCUSSION

### A. STANDARD OF REVIEW

In evaluating a juvenile court's decision to waive its jurisdiction, the Texas Court of Criminal Appeals has instructed us to

> first review the juvenile court's specific findings of fact regarding the [s]ection 54.02(f) factors under "traditional sufficiency of the evidence review[]" [and] then review the juvenile court's ultimate waiver decision under an abuse of discretion standard. That is to say, in deciding whether the juvenile court erred to conclude that the seriousness of the offense alleged and/or the background of the juvenile called for criminal proceedings for the welfare of the community, the appellate court should simply ask, in light of its own analysis of the sufficiency of the evidence to support the [s]ection

9

54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles. In other words, was its transfer decision essentially arbitrary, given the evidence upon which it was based, or did it represent a reasonably principled application of the legislative criteria? And, of course, reviewing courts should bear in mind that not every [s]ection 54.02(f) factor must weigh in favor of transfer to justify the juvenile court's discretionary decision to waive its jurisdiction.

*Moon*, 451 S.W.3d at 47. Further, we are to measure sufficiency of the evidence to support the juvenile court's stated reasons for transfer by considering the sufficiency of the evidence to support the facts as they are expressly found by the juvenile court in its certified order. *Id.* at 49.

## B. ANALYSIS

In arguing that "the factual evidence introduced at trial established that the juvenile court should have retained jurisdiction because there were sufficient safeguards in place for the public and a very high probability of rehabilitation for D.C. by use of procedures, services, and facilities currently available to the juvenile court," D.C. points us only to a portion of testimony from his probation officer, Rosalyn Smiley. Specifically, D.C. points to the following exchange between his counsel and Smiley:

Q. And are you aware of the Violent Offender Unit at [Texas Juvenile Justice Department] called Giddings State School?

A. Yes.

Q. And in that -- within that unit, which is a highly structured, highly-confined unit, there is a special unit called the Violent Offender Unit?

A. For capital offenses, correct.

10

Based upon Smiley's agreement with his counsel's characterization of the Giddings State School as "a highly structured, highly-confined unit" for capital offenses, D.C. contends "[t]he overwhelming weight of the evidence supported a finding" that the juvenile court should retain jurisdiction and deny the State's petition.

Saying that a "highly structured, highly confined unit" for capital offenses *exists* does not, as D.C. contends, conclusively establish D.C.'s placement there would result in a "very high probability" of his rehabilitation. *See* Tex. Fam. Code Ann. § 54.02(f)(4). And the record shows there was ample evidence to support the trial court's finding that "the likelihood of reasonable rehabilitation of [D.C.] by the use of procedures, services, and facilities currently available to the [j]uvenile [c]ourt is low."

Tarrant County Juvenile Services supervisor Debbie Spoonts testified that she performed a placement search for D.C., meaning she reviewed all the information related to D.C.'s situation and then looked to see whether there would be an appropriate placement for him. In total, Spoonts contacted six private facilities located in three different states, including at least one secure facility, and each of those facilities refused to serve as a placement for D.C. because of the seriousness of the offenses he allegedly committed. She stated that her department could not offer D.C. any services other than at-home probation.

11

Smiley, who prepared D.C.'s diagnostic study, testified that the juvenile probation office could not offer D.C. any services if he were to be placed on at-home probation. And in the diagnostic study she prepared, which was introduced into evidence at the hearing, Smiley stated that D.C. would not benefit from additional supervision by her department "due to the fact that he doesn't believe that he needs supervision." The diagnostic study further reflects that D.C.'s father had been incarcerated for capital murder and that his mother was on probation for burglary of a habitation. But D.C. denied they were responsible for those crimes, stating that his father had simply been at the wrong place at the wrong time and that his mother was unaware that a burglary was taking place, as it was others who were committing the burglary. D.C. applied this same viewpoint toward his own delinquent conduct, denying responsibility for it, blaming others for it, and not taking his pending charges seriously.

Given the foregoing evidence, we conclude factually sufficient evidence supports the trial court's section 54.02(f)(4) finding. *See Moon*, 451 S.W.3d at 47. We thus turn to whether the juvenile court abused its discretion—i.e., acted without reference to guiding rules or principles—in reaching its decision to waive its jurisdiction and to transfer D.C. to criminal district court. *See id.*; *In re J.R.*, No. 02-17-00468-CV, 2018 WL 1755236, at *8 (Tex. App.—Fort Worth Apr. 12, 2018, no pet.) (mem. op.).

The record reflects that the juvenile court carefully considered this matter. The record from the evidentiary hearing includes surveillance photographs and

12

police officers' testimony, which reveal that D.C., along with others, engaged in a pattern of conduct that included stealing motor vehicles and personal property; burglaries; aggravated robberies; and capital murder. The juvenile court also ordered and received a diagnostic study, which detailed the investigation of offenses alleged against D.C., his unstable home life, and his previous criminal history. Further, the record included documentary and testimonial evidence that six potential juvenile placements for D.C. were denied. Moreover, the transfer order includes the findings specified under section 54.02(f), and each of those findings is sufficiently supported by the evidence. *See* Tex. Fam. Code Ann. § 54.02(f).

On this record and in light of these findings, we cannot say that the juvenile court's decision was arbitrary or made without reference to guiding rules. Rather, the juvenile court's decision resulted from a principled application of legislative criteria. *See Moon*, 451 S.W.3d at 47. Accordingly, we find no abuse of discretion in the juvenile court's decision to waive jurisdiction and to transfer D.C. to criminal district court. *See J.R.,* 2018 WL 1755236, at *8.

We overrule D.C.'s sole issue.

## V. CONCLUSION

Having overruled D.C.'s sole issue, we affirm the juvenile court's order waiving its jurisdiction and transferring D.C. to criminal district court. *See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL:  SUDDERTH, C.J.; WALKER and GABRIEL, JJ.

DELIVERED:  August 03, 2018